IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

OCT 1 1 2006

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

| | |
|---|---|
| DEBORAH A. DOUGLASS, | CIVIL ACTION NO. 3:05-CV-00018 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| TIMOTHY SANOK, ET AL., | |
| *Defendants.* | JUDGE NORMAN K. MOON |

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Timothy Sanok and W.L. Morris on September 5, 2006 (docket entry no. 35). This motion was argued before the Court on September 14, 2006. For the reasons set forth below, Defendants' motion will be GRANTED in an order to follow.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a Court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment under Federal Rule of Civil Procedure 56 is appropriate only when the court, viewing the record as a whole and drawing reasonable inferences in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See id.*; *see, e.g., Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322-24 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994); *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc,* 763 F.2d 604, 610 (4th Cir. 1985).

If the nonmoving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing' … an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325. If the moving party shows such an absence of evidence, the burden shifts to the nonmoving party to set forth specific facts illustrating genuine issues for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. A court must grant a motion for summary judgment if, after adequate time for discovery, the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. The nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but … [must] by affidavits or as otherwise provided in … [Rule 56] set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

## II. BACKGROUND

### A. Procedural history

This action arises from an incident on March 21, 2002, when Greene County Sheriff's Department officers detained Plaintiff in her home and subsequently transferred her to a local hospital. (*See* Pl.'s Answers to Def.'s First Interrogs. 2-3) Plaintiff originally filed suit in Greene County Circuit Court in March 2004 and Defendants removed the action to this Court on April 5, 2005. Plaintiff claims Defendants violated her constitutional rights and seeks damages under 42 U.S.C. § 1983; she also claims Defendants violated Virginia law and seeks damages for assault

and battery, false arrest, false imprisonment, and malicious prosecution. (*See* Mot. for J. ¶ 1)

Plaintiff named five defendants in the original complaint. Of those five, three are not a party to the motion currently before the Court: Defendant Shawn Hill ("Hill"), a Greene County Sheriff's Department officer, was not properly served with process and this Court dismissed Plaintiff's case against Hill by an order entered May 19, 2005; Defendant Greene County Sheriff's Department was dismissed from the case by an order entered September 19, 2006, as the Court found it has Eleventh Amendment immunity; and Defendant Gregory Pittsenbarger ("Pittsenbarger"), also a Greene County Sheriff's Department officer, has not yet been served with process and is not a party to the motion currently before the Court. Defendants Timothy Sanok ("Sanok"), a Greene County Sheriff's Department officer, and William L. Morris ("Morris"), the Greene County sheriff, brought this motion for summary judgment.

### B. *Factual history*

On March 21, 2002, Plaintiff, alternatively suspecting that someone was stealing materials being used to renovate her house (Compl. ¶ 6; Douglass Dep. 16:16, 20:21-22, 26:22-27:2, Aug. 30, 2006), stealing her clothes (Pl.'s Answers to Def.'s First Interrogs. 2; Douglass Dep. 27:18-28:10), stealing a weed-eater (Pl.'s Answers to Def.'s First Interrogs. 2; Douglass Dep. 28:13-15), loitering in her yard and stalking her (Douglass Dep. 88:13-93:16), and making threats against her life (Pl.'s Answers to Def.'s First Interrogs. 2; Douglass Dep. 16:17, 28:22-29:16, 30:9-16, 56:10-11, 58:13-20), called the Greene County Sheriff's Department as many as ten times (Douglass Dep. 20:9-17, 25:23-26:1-2), and, as defense counsel stated at the motion hearing, possibly as many as eighteen times. Hill answered Plaintiff's calls at least once and upon his asking Plaintiff whether he should go to Plaintiff's house to discuss these matters,

Plaintiff agreed. (Pl.'s Answers to Def.'s First Interrogs. 2; Douglass Dep. 59:9-12) ("Hill asked me if he could come and talk to me … and I agreed….") Hill states that his reason for offering to go to Plaintiff's house was because Plaintiff "seemed to be delusional and was both laughing and crying" during the conversation; he therefore wanted to perform a "welfare check." (Hill Aff. ¶¶ 6-7)

Hill and Sanok, driving separately, arrived at Plaintiff's home. Plaintiff allowed both officers to enter her home, but, despite the urgency with which Plaintiff requested law enforcement assistance in her repeated calls to the sheriff's department (*See, e.g.*, Douglass Dep. 26:14) ("It's urgent. It's very, very urgent."), she was "surprised" and "scared" that two sheriff's officers arrived at her house. (*See* Pl.'s Answers to Def.'s First Interrogs. 2) ("This was around 6:00 p.m. and what were two police officers doing at my home?") Plaintiff, however, never asked Sanok to leave her home. (Douglass Dep. 106:9-12) Here, the parties' versions of events take divergent paths.

Plaintiff claims that although Hill arrived at the house to "investigate [her] situation," he nonetheless pushed her, grabbed her, pushed his thumbs into her back hard enough to cause bruises, and "plunked" her down on her couch — all without provocation. (Douglass Dep. 60:9-61:13) Sanok was likely not in the same room. (*See* Douglass Dep. 62:4) ("And by that time Sanok comes in ….") According to Plaintiff, the officers then told her that they were going to detain her, at which point she put her arms across her chest and said "This is my home, my own personal space. You can't do this to me." (Pl.'s Answers to Def.'s First Interrogs. 2) Despite this initial resistance, Hill and Sanok apparently allowed her to try to make telephone calls to two of her girlfriends and to her psychologist, Doctor William Carter. (*See* Pl.'s Answers to Def.'s First

Interrogs. 2; Douglass Dep. 62:9-64:6) Plaintiff states that while she was on hold with a hospital representative trying to get in touch with Carter, Hill hung up the telephone. (Pl.'s Answers to Def.'s First Interrogs. 2; Douglass Dep. 64:4-7, 66:18-22).

Defendants' recollection of the events to this point are quite different. Neither Hill nor Sanok say anything about pushing Plaintiff. Instead, Hill, who said that Plaintiff's house was "unkempt and dirty with old food and dirty dishes," tried to have a conversation with Plaintiff, but that she was "once again … very delusional and unable to engage in rational conversation." (Hill Aff. ¶¶ 8-9) Sanok agreed, saying that Plaintiff "seemed very irrational and delusional." (Def. Sanok's Answers to Pl.'s First Interrogs. to Def. 2)

After asking Plaintiff whether she was seeing a mental health professional, Hill asked Plaintiff to try to get someone on the telephone, evidently so Hill could determine whether Plaintiff was, in fact, suffering from a mental disease. (*See* Hill Aff. ¶¶ 9-10) According to Hill, Plaintiff "acted as though she had dialed someone and then was speaking into the phone as if she was engaging in conversation during a pre-recorded phone company message." (Hill Aff. ¶ 10) Sanok agreed. (Def. Sanok's Answers to Pl.'s First Interrogs. to Def. 2) ("The woman picked up the telephone and acted like she was dialing a number. As she was acting like she was talking to someone, we could hear quite clearly the pre-recorded message saying, 'If you would like to make a call, please hang up.' … She hung up the phone and told us that she had talked to [someone].") Sanok said Plaintiff repeated the action. (Def. Sanok's Answers to Pl.'s First Interrogs. to Def. 2) ("[S]he again picked up the phone, pretended to dial a number, and talked to the pre-recorded message. This time though, she started screaming into the phone something like 'help me, they are trying to take me.' She was hysterical. She was laughing one second and

crying the next.") Hill asked Plaintiff to accompany him to speak to a mental health counselor, but she refused. (Hill Aff. ¶ 12) Hill then told Plaintiff that if she would not go voluntarily, he would have to detain her and take her to the hospital to speak with a professional. (Hill Aff. ¶ 14)

Plaintiff admits that she then ran to her bedroom, locked the door, and used her body to keep it closed. (Pl.'s Answers to Def.'s First Interrogs. 2) Despite the fact that both Hill and Sanok told her to open the door, she refused to do so. (Douglass Dep. 67:7-68:2) Sanok said he and Hill were able to unlock the door, but that Plaintiff was still using her body to keep the door closed. (Def. Sanok's Answers to Pl.'s First Interrogs. to Def. 2; Pl.'s Answers to Def.'s First Interrogs. 2) Plaintiff claims that while the officers were in the process of forcing their way into her room, she inadvertently "brushed" Sanok's pants and ended up face down on her bed (Pl.'s Answers to Def.'s First Interrogs. 2); Sanok and Hill claim, however, that Plaintiff "kicked [Sanok] in the groin" (Def. Sanok's Answers to Pl.'s First Interrogs. to Def. 2). Plaintiff then resisted the officers' multiple attempts to handcuff her. (Douglass Dep. 69:7-11, 12-17, 70:7-71:16) She admitted that she "was laying down, and I had my hands … [i]n front of me" and stated seven times that she was resisting the officers despite their threats to use pepper spray if she did not comply with their orders. (Douglass Dep. 69:7-11, 12-17, 70:7-71:16)

Hill then sprayed pepper spray into Plaintiff's eyes and handcuffed her. (*See* Douglass Dep. 71:17-73:6) The officers shackled Plaintiff's feet (Douglass Dep. 73:7-8). Plaintiff said Hill then inserted a pole from the handcuffs on Plaintiff's hands to the shackles on her feet and lifted her up "like he was Mr. Strong Guy," but that "he dropped me. And my elbow … was just hurting so badly." (Douglass Dep. 73:20-22)

Although Sanok says they sat Plaintiff on the couch and rinsed out her eyes (Def. Sanok's

Answers to Pl.'s First Interrogs. to Def. 3), Plaintiff says that never happened (Douglass Dep. 76:10-13). Sanok opened Plaintiff's front door while Hill directed Plaintiff outside and toward the patrol cars. (Douglass Dep. 78:3-9) Hill then took Plaintiff to the University of Virginia emergency department. (Def. Sanok's Answers to Pl.'s First Interrogs. to Def. 3; Hill Aff. ¶ 21) According to Hill, the hospital treated Plaintiff and a temporary detention order was issued because of her mental state. (Hill Aff. ¶ 22)

A screening technician also noted that Plaintiff was labile — "crying one minute and then laughing uncontrollably the next." Virginia Health System Psychiatry Services, Psychiatric Admission History & Physical Examination (March 21, 2002). Upon a finding that Plaintiff was mentally ill, an imminent danger to herself or others, not able to take care of herself, and not able to consent to voluntary hospitalization, Plaintiff was committed to the hospital for four days, after which time she was released. Plaintiff was later charged under Virginia law with obstruction of justice and assaulting an officer. A state court ordered Plaintiff to undergo psychiatric evaluation to determine both whether she was sane at the time of the offense and whether she was competent to stand trial. Eight months later, the prosecutor decided to *nolle prosequi* the charges.

Accordingly, Plaintiff alleges that her constitutional rights were violated because, as she says, she was unlawfully arrested and seized, she was the victim of an excessive use of force, and Defendants failed to provide her adequate medical care. Additionally, Plaintiff asserts state law claims of assault and battery, false arrest, false imprisonment, and malicious prosecution. She seeks damages for her alleged injuries suffered at the hands of Defendants; those injuries include

a chipped tooth, a broken elbow,[1] bruises to her back, several eye surgeries, and psychological damage. (*See* Pl.'s Answers to Def.'s First Interrogs. 4)

The Court will first address Plaintiff's § 1983 claims, both as against Defendant Sanok and as against Defendant Morris. The Court will then examine Plaintiff's state law claims against both Defendants.

### III. DISCUSSION: § 1983 CLAIMS AGAINST DEFENDANT SANOK

Plaintiff has sued pursuant to 42 U.S.C. § 1983, which allows citizens to recover for alleged constitutional violations committed against them.[2] Plaintiff has alleged that the constitutional violations Defendant Sanok and Defendant Morris committed include unlawful arrest and seizure, excessive use of force, and failure to provide adequate medical care.

Defendants here have asserted the defense of qualified immunity, which "shields law enforcement officers performing discretionary duties from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Turmon v. Jordan*, 405 F.3d 202, 204 (4th Cir. 2005) (internal quotation marks omitted). As the Supreme Court recently held, a trial court should make a ruling on qualified immunity far enough in advance of trial in order to avoid the costs and expenses of trial. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Turmon*, 405 F.3d at 204. Qualified immunity is "an immunity from suit rather than a mere defense to liability; ... it is effectively lost if a case is erroneously permitted to go to trial." *Saucier*, 533 U.S. at 200-201.

---

[1] Defendant admits, however, that she is uncertain whether the events that transpired on March 21, 2002 led to her broken elbow.

[2] Section 1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects ... any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983 (2000).

There are two questions — which must be answered in sequence —– in addressing a qualified immunity defense. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 200, 201; *Turmon* 405 F.3d at 204. Inherent in answering this question is the need to identify the constitutional right that Defendants allegedly violated. *See, e.g., S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 265 (4th Cir. 1998). If the alleged facts do *not* show that the officer's conduct violated a constitutional right, then "there is no necessity for further inquiries concerning qualified immunity," *Saucier*, 533 U.S. at 201; "that ends the matter and the offic[er] is entitled to immunity," *Turmon*, 405 F.3d at 204-05 (alteration in original) (internal quotation marks omitted).

But assuming the answer to the first inquiry was yes, "the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201. To answer that question, the Court states that "[t]he relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

Ordinarily, a qualified immunity determination should be made at the summary judgment stage. *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006). But, as the court in *Schultz* pointed out, "qualified immunity does not override the ordinary rules applicable to summary judgment proceedings." *Id.* (internal quotation marks omitted).

The question of whether the offending conduct "actually occurred ... may or may not be ... subject to determination as a matter of law" at the summary judgment stage. *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir.1992). "If there are genuine issues of historical fact respecting the officer's conduct," the Fourth Circuit stated, "summary judgment is not appropriate, and the

issue must be reserved for trial." *Id.*

Whether a constitutional right was clearly established, however, is a matter of law for the court to decide; this decision, therefore, can be appropriately made at the summary judgment stage. *Id.* ("The narrow threshold question whether a right allegedly violated was clearly established at the appropriate level of inquiry and at the time of the challenged conduct is always a matter of law for the court, hence is always capable of decision at the summary judgment stage.").

With this basic analytical framework in mind, the Court now turns to each of Plaintiff's § 1983 claims.

## A. Unlawful Arrest and Seizure

### 1. Sanok's conduct did not violate Plaintiff's right to be free from unreasonable seizure

The first constitutional right that Defendants allegedly violated, according to Plaintiff, is her Fourth Amendment right to be free from an unreasonable search and seizure. Having identified this as the constitutional right at issue, the next question the Court must address is whether, in a light most favorable to Plaintiff, the facts alleged show that Sanok's conduct violated that constitutional right. In other words, was Sanok's arrest of Plaintiff unreasonable?

The Virginia legislature has given law enforcement officers permission to detain a person for emergency custody if the person meets certain criteria. If an officer's conduct complies with this statute —Virginia Code § 37.1-67.01[3] — his actions are per se reasonable. Under section 37.1-67.01, an officer "who, based upon his observation or the reliable reports of others, has probable cause to believe that a person meets the criteria for emergency custody … may take that

---

[3] Section 37.1-67.01 is now codified at 37.2-808, but the two provisions are virtually identical. The minor differences in the language of the two statutes have no bearing on the issue before the Court.

person into custody and transport that person to an appropriate location to assess the need for hospitalization or treatment without prior authorization." Va. Code Ann. § 37.1-67.01 (West 2002). The statute sets forth the criteria for emergency custody: if the law enforcement officer has probable cause to believe that a person is "mentally ill and in need of hospitalization and that the person presents an imminent danger to self or others as a result of mental illness, or is so seriously mentally ill as to be substantially unable to care for self," he "may take that person into custody and transport that person to an appropriate location to assess the need for hospitalization without prior authorization." *Id.* Compliance with this statute, then, would be *per se* reasonable for the purposes of the Fourth Amendment.

The question then is whether Sanok had probable cause to believe that Plaintiff met the criteria for emergency custody under section 37.1-67.01. Virginia courts have stated that probable cause for an arrest exists when "the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution" to, here, believe that Plaintiff met the criteria for emergency custody. *See, e.g., Schaum v. Commonwealth*, 211 S.E.2d 73, 75 (Va. 1975).

There are multiple undisputed facts of which Sanok was aware on March 21, 2002, that lead to the conclusion that he had probable cause to detain Plaintiff. For example, Sanok was told by his supervisor, Hill, that the express purpose of the officers' visit to Plaintiff's house was for a "possible ... Emergency Custody Order." (Def. Sanok's Answers to Pl.'s First Interrogs. to Def. 2) Plaintiff does not dispute the fact that she made at least ten calls to the Sheriff's Department that day and Sanok knew of these calls (*See* Def. Sanok's Answers to Pl.'s First Interrogs. to Def. 2), which, along with other circumstances surrounding his visit to Plaintiff's house, could

certainly lead to Sanok believing that Plaintiff was perhaps suffering from a mental illness. A reasonable person in Sanok's shoes could conclude that someone calling non-emergency sheriff's department personnel that many times in such a short amount of time, when seen in light of the many other surrounding circumstances, could be mentally ill and require emergency custody. Sanok thought that Plaintiff was acting delusionally and irrationally because she was "laughing one second and crying the next" (Def. Sanok's Answers to Pl.'s First Interrogs. to Def. 2), a fact that Plaintiff does not deny. Additionally, Plaintiff's house appeared to be in disarray. (Hill Aff. ¶ 8) ("When we arrived at her house it was unkempt and dirty with old food and dirty dishes everywhere.") At oral argument, Plaintiff did not dispute this, but instead characterized it as merely lending credence to the proposition that Plaintiff "doesn't do her dishes." It would be reasonable for Sanok, however, especially given the other circumstances known to him that day, to believe that Plaintiff was unable to care for herself, which is one of the criteria under section 37.1-67.01.

Additionally, after Defendants merely requested that Plaintiff accompany the officers for an evaluation, Plaintiff ran to her bedroom, locked the door, and barricaded herself in. (Def. Sanok's Answers to Pl.'s First Interrogs. to Def. 2) Faced with this resistance, Sanok could conclude that Plaintiff was an imminent danger to herself or to the officers. Based on all of these facts and circumstances, a "man of reasonable caution" could certainly believe that Plaintiff met the statutory criteria to be detained under section 37.1-67.01.

In a light most favorable to Plaintiff, therefore, Sanok had probable cause to detain Plaintiff under section 37.1-67.01 and therefore his conduct did not violate the Fourth Amendment. Accordingly, Plaintiff's arrest was not unreasonable and Sanok is entitled to

qualified immunity.

## 2. *Assuming Plaintiff's arrest was unreasonable, Plaintiff's right was not clearly established.*

Even if there was no probable cause for Plaintiff's arrest under any circumstances and Plaintiff's arrest was somehow unreasonable, the Court must then ask the second question: whether Plaintiff's right to be free from unreasonable search or seizure was clearly established.

Whether a right is "clearly established," according to the Supreme Court, hinges on "whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted.*" *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (emphasis added). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *E.g., Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006). Therefore, the right allegedly violated must have been established "in a more particularized, and hence more relevant, sense." *Saucier*, 533 U.S. at 202 (internal quotation marks omitted).

With respect to taking custody of individuals for psychological evaluations, courts have "lamented the lack of clarity in the law," *see, e.g., S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 266 (4th Cir. 1998) (internal quotation marks omitted), even concluding that "the law was not clear," *id.* at 266, 267 (concluding under the facts of the case[4] that there existed no clearly

---

[4] In many respects, the facts of *S.P.* are more innocuous than the facts in the present case. In *S.P.*, a husband and wife had an argument, the husband left the house and ultimately contacted information for the number to a mental health hotline or for a marriage counselor. *S.P.*, 134 F.3d at 264. His call was eventually routed to a police emergency dispatcher who sent police officers to his house. *Id.* The officers found the wife visibly upset and they told her they were going to detain her for an emergency psychiatric evaluation, but she refused to comply. *Id.* The court upheld the district court's dismissal of the wife's § 1983 claim that her arrest was unlawful. *Id.* at 274.

established authority that would have put those officers on notice that their conduct violated the Fourth Amendment). As such, a reasonable officer would not deem his conduct to be unlawful when confronted with the knowledge and circumstances that Sanok had "in the situation he confronted," that is, at the time of Plaintiff's arrest.

There is no question that in the abstract, an unlawful arrest equates to a constitutional violation. But as the Supreme Court in *Saucier* made clear, the pertinent inquiry is whether the right allegedly violated was established in a more "particularized" and "relevant" sense. So here, under the circumstances before the Court in this case, and more specifically with respect to the immunity question at issue, a reasonable person in Sanok's shoes would not think he was violating Plaintiff's constitutional rights. Plaintiff's right — specific to the facts of this case — was therefore not clearly established.

* * *

In sum, the Court finds that in a light most favorable to Plaintiff, Sanok had probable cause to detain Plaintiff and therefore her arrest did not violate the Fourth Amendment. Assuming, however, that Sanok did not have probable cause and that Plaintiff's arrest was unreasonable, the Court finds that the Plaintiff's constitutional right to be free from unreasonable seizures — in the facts and circumstances of this case — was not clearly established. For these reasons, Defendant Sanok's motion for summary judgment with respect to Plaintiff's § 1983 claims regarding an unlawful arrest will hereby be granted.

### B. Excessive Use of Force

Plaintiff next claims that Defendants used excessive force in their detention of Plaintiff in violation of her Fourth Amendment rights. More specifically, Plaintiff claims that three actions

by the Defendants constitute excessive force: (1) they physically pushed her; (2) their use of pepper spray; and (3) their "method used for removing" Plaintiff from her home.

With respect to Sanok, then, the Court must now consider whether, in a light most favorable to Plaintiff, the facts alleged show that Sanok's conduct violated a constitutional right; that is, was Sanok's use of force unreasonable?

Plaintiff's excessive force claim is properly analyzed under the Fourth Amendment's "objective reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386, 394-396, 397 (1989). ("[T]he question is whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). This reasonableness should not be viewed in hindsight, but rather "from the perspective of a reasonable officer on the scene." *Id.* at 396, 397. ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment") (citations omitted) (internal quotation marks omitted).

A careful review of the "pleadings, depositions, answers to interrogatories, and admissions on file," Fed. R. Civ. P. 56(c), however, shows that Plaintiff's § 1983 claim against Sanok with respect to excessive force cannot stand.

Plaintiff claims, generally, that Defendants physically pushed her, and that constituted excessive force. But Plaintiff herself alleges that *Hill* pushed her onto the couch. (Douglass Dep. 60:12-19, 61:6-62:8) Not only did Sanok not use excessive force, he used no force at all.

Similarly, Plaintiff claims, generally, that Defendants used excessive force when they used pepper spray on her. Again, however, Plaintiff herself says that it was *Hill* who used the pepper spray. (*See* Douglass Dep. 70:2-71:23) Sanok, therefore, could not have used excessive

force by spraying Plaintiff's eyes with pepper spray.

Finally, Plaintiff claims, generally, that Defendants used excessive force by the "method used for removing" her from her home. Plaintiff states, however, that *Hill* was the one responsible for removing her from her home. According to Plaintiff, Hill lifted her up "like he was Mr. Strong Guy," but that "he dropped me. And my elbow … was just hurting so badly." (Douglass Dep. 73:20-22; 77:13-78:9) (stating that Sanok was not holding Plaintiff when the parties left her home, but that instead, Sanok had gone out Plaintiff's front door first)

Assuming without deciding that Plaintiff's facts are true, then, it is quite clear that with respect to Sanok, there are simply no issues of material facts here that would allow Plaintiff's § 1983 excessive force claims against him to continue. Based on the undisputed facts before the Court, Defendant Sanok is entitled to judgment as a matter of law. Defendant Sanok's motion for summary judgment with respect to Plaintiff's § 1983 claims regarding excessive force will therefore be granted.

### C. Failure To Provide Adequate Medical Care

Plaintiff next claims that Defendants' actions "violated plaintiff's clearly established rights … to medical care for injuries received while in custody." (Compl. ¶ 25)

If Plaintiff is claiming that she received inadequate medical care, such a claim is properly analyzed under the Fourteenth Amendment, *see Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001); rights of pre-trial detainees under the Fourteenth Amendment, however, "are at least as great as the Eighth Amendment protections available to a convicted prisoner," *id.*

For a plaintiff to succeed under an inadequate medical care claim, she must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."

*Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A plaintiff must therefore show that, objectively, she had a serious medical need, *see, e.g., Farmer v. Brennan*, 511 U.S. 825 (1984), and that the officer had a state of mind that amounted to a "deliberate indifference" to that medical need, *see id.* Deliberate indifference requires that the offensive treatment (or lack thereof) be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" and can be shown either by actual intent or by reckless disregard. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).

Plaintiff here says that Sanok didn't allow her to rinse out eyes at home; Sanok and Hill say they did. Regardless of whether this is true, the controlling — and undisputed — fact is that immediately after spraying Plaintiff's eyes with pepper spray, the officers took Plaintiff to a hospital for treatment. In *Young v. City of Mount Ranier*, the Fourth Circuit held that officers who used pepper spray on a PCP user who subsequently died after being placed face down in the officers' car and in the emergency room did not display deliberate indifference to a serious medical need, especially when there was no way for the officers there to know that the victim was a PCP user. *See Young*, 238 F.3d 567, 576 (4th Cir. 2001). In fact, the Fourth Circuit held that given the victim's "erratic behavior and his acknowledged struggle with law enforcement officers, the mere use of pepper spray in this case cannot be considered a Fourteenth Amendment violation." *Id.*

Here, Plaintiff admittedly resisted the officers' multiple attempts to detain her despite their threats to use pepper spray if she continued to resist. The officers used the pepper spray, then immediately took Plaintiff to the hospital emergency room for treatment. Following *Young*, there was no deliberate indifference here on the part of Sanok. As such, Plaintiff's § 1983 claim

that Sanok failed to provide adequate medical care must be dismissed.

## IV. DISCUSSION: § 1983 CLAIMS AGAINST DEFENDANT SHERIFF MORRIS

On the most liberal reading of Plaintiff's complaint, the only § 1983 claim she could have against Sheriff Morris is for supervisory liability. (*See* Compl. ¶ 22; Pl.'s Answers to Def.'s First Interrogs. 9) ("Sheriff W.L. Morris tolerated misconduct by his officers, and/or encourag[ed] misconduct by failing to adequately supervise, discipline, or train his officers in the proper handling of individuals with mental disabilities and in determining when medical intervention is called for.").[5] Plaintiff admits that Sheriff Morris did nothing wrong in this case other than allegedly failing to properly train his officers. (*See* Douglass Dep. 104:21-105:2)

To state a claim for supervisory liability under § 1983, a plaintiff must prove three elements: (1) "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) "that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) "that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted). A high level of proof is required from plaintiffs asserting a supervisory liability claim. *See Randall v. Prince George's County, Md.*, 302 F.3d 188, 207 (4th Cir. 2002) ("[C]ourts have appropriately required proof of multiple instances of misconduct before permitting supervisory liability to attach."). Consistent with the analysis under Rule 56 of the Federal Rules of Civil Procedure, "[t]his high level of proof cannot

---

[5] Plaintiff admits that Sheriff Morris was not at Plaintiff's house on the evening in question. (*See* Douglass Dep. 15:21-23)

be satisfied at the summary judgment stage by the plaintiff's mere allegations." *Wilson v. Kittoe*, 229 F. Supp. 2d 520, 537 (W.D. Va. 2002).

Here, Plaintiff has only alleged in broad language that Sheriff Morris should be held liable under § 1983. (*See* Compl. ¶ 22; Pl.'s Answers to Def.'s First Interrogs. 9) As to the first prong under *Shaw* (knowledge by Sheriff Morris that Sanok was engaged in risky conduct), Plaintiff admits that she "ha[s] no idea" whether Morris knew about the events that transpired at her house on March 21, 2002. (*See* Douglass Dep. 101:5-8) As to the second prong under *Shaw* (Sheriff Morris's response to that knowledge was so inadequate as to amount to deliberate indifference to his officers' conduct), Plaintiff merely alleges, in conclusory terms, that Morris "didn't teach his officers the proper instruction or follow-through on actions that were taken against me and train them in their field as what to do with a so-called mentally ill person." (Douglass Dep. 102:3-7) In fact, Plaintiff admits she does not know what kind of training Sheriff Morris *actually* provided to his officers and only offers her personal opinion with respect to the type of training Morris *should have* provided to his officers. (Douglass Dep. 102:17-103:13) As to the third prong under *Shaw* (causation), the record is devoid of any causation evidence.

In sum, Sheriff Morris has discharged his burden by showing an absence of evidence to support Plaintiff's § 1983 supervisory liability claim.[6] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Therefore, the burden shifts to Plaintiff to "set forth specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. Because Plaintiff has failed to allege any facts whatsoever with respect to her § 1983 claim against Sheriff Morris, the Court finds that summary judgment is appropriate. The Court therefore grants

---

[6] The Court notes, too, that Plaintiff did not broach the subject of her § 1983 claim against Sheriff Morris in her Memorandum in Support of Her Answer to Defendants' Motion for Summary Judgment.

Defendant Sheriff Morris's motion with respect to the § 1983 claims against him.

## V. DISCUSSION: VIRGINIA STATE LAW CLAIMS

Plaintiff's state-law claims of assault, battery, false arrest, false imprisonment, and malicious prosecution similarly cannot withstand scrutiny.

### A. Assault and Battery

Under Virginia law, the tort of assault is "an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery." *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003). The court in *Koffman* defined the tort of battery as "an unwanted touching which is neither consented to, excused, nor justified." *Id.* (noting, too, that although "these two torts go together like ham and eggs," one can exist without the other).

#### 1. Discussion as to Deputy Sheriff Timothy Sanok

With respect to both charges, there is simply no evidence before the Court that Sanok either touched Plaintiff or threatened to touch Plaintiff in such a way as to cause her to fear an imminent touching. Because Plaintiff has failed to allege facts giving rise to both assault and battery claims, those claims must fail as a matter of law, and this Court must grant Defendant Sanok's motion for summary judgment with respect to Plaintiff's assault and battery claims.

#### 2. Discussion as to Sheriff William L. Morris

For the same reasons that Plaintiff cannot succeed against Sanok, Plaintiff's assault and battery claims against Morris must also fail. Plaintiff's uncontroverted evidence shows that Sheriff Morris was not at Plaintiff's house on March 21, 2002. Because Morris was not physically present, he could not have assaulted or battered Plaintiff.

The Court therefore grants Defendants' motion for summary judgment with respect to Plaintiff's assault and battery claims.

## B. False Arrest and False Imprisonment

False imprisonment is the "restraint of one's liberty without sufficient cause." *Zayre of Va. v. Gowdy*, 147 S.E.2d 710, 713 (Va. 1966). A lawful arrest cannot give rise to a false imprisonment or false arrest claim. *See, e.g., Yeatts v. Minton*, 177 S.E.2d 646, 649 (Va. 1970) ("A person can be falsely imprisoned despite probable cause for his arrest; he cannot be falsely imprisoned pursuant to a lawful arrest.").

### 1. Discussion as to Deputy Sheriff Timothy Sanok

Having already decided that Sanok's seizure of Plaintiff was lawful, *see supra* Part III.A.1, it logically follows that Plaintiff's arrest cannot be unlawful. Therefore, she can have no claim for false imprisonment or false arrest and these claims must also fail as a matter of law.

### 2. Discussion as to Sheriff William L. Morris

As with Plaintiff's assault and battery claims against Defendant Morris, her claims against Sheriff Morris for false arrest and false imprisonment must, too, fail. Morris was not involved with Plaintiff's detention and therefore could not be liable for false arrest or false imprisonment as a matter of law.

Accordingly, the Court will grant Defendants' summary judgment motion with respect to Plaintiff's false imprisonment and false arrest claims.

## C. Malicious Prosecution

Plaintiff must prove four elements to succeed in her malicious prosecution claim: she must show by a preponderance of the evidence that "the prosecution was (1) malicious; (2)

instituted by, or with the cooperation of, the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the Plaintiff." *Baker v. Elmendorf*, 628 S.E.2d 358, 359 (Va. 2006).

Although it is true here that element (4) is likely met (the subsequent charges against Plaintiff were *nolle prosequied*), the record before the Court is devoid of any evidence to support the other three elements. Plaintiff merely alleges in her complaint that the Defendants "lacked probable cause" and brought criminal charges against her "maliciously." (Compl. ¶ 35) Because there is no evidence to support Plaintiff's claim for malicious prosecution, the Court will grant Defendants' motion for summary judgment with respect to this claim.

## V. CONCLUSION

The Defendants' motion for summary judgment will be GRANTED in full in an order to follow.

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion to all counsel of record.

ENTERED: _____
United States District Judge

*October 11, 2006*
Date